We'll hear argument first this morning in Case 18-725, Barton v. Barr. Mr. Unikowsky. Mr. Chief Justice, and may it please the Court, the question before the Court today is, what does it mean for an offense to render an alien inadmissible for purposes of the stop-time rule? The Court should hold that an offense renders an alien inadmissible if the immigration judge finds that the offense renders the alien inadmissible at the removal hearing that precipitates the need to apply the stop-time rule. If the Court disagrees with that and agrees with the Eleventh Circuit that inadmissible is a status, it should hold that an alien acquires that status when the alien is capable of being charged with inadmissibility. In this case, neither condition is satisfied. Petitioner was not found inadmissible. He wasn't capable of being found inadmissible. Therefore, he was not rendered inadmissible. So I'd like to begin this morning with the concession the government makes at pages 29 and 30 of its brief, which I think narrows the issues in this case somewhat. So the government concedes that when the words inadmissible and removable, which are the crucial words in the stop-time rule, when those words are used in a statute that has a connection to the alien's own removal proceeding, they're a reference to the charge against the alien at that proceeding. They're not a status. So the government agrees that in those contexts, its proposed interpretation of the words inadmissible and removable in the stop-time rule is incorrect. So in Section 1226, the mandatory detention statute, that says that an alien who is inadmissible by reason of having committed an offense under Section 1182 is subject to mandatory detention, the government agrees there that inadmissible is a reference to inadmissible at the proceeding, not just the status of being inadmissible. The government says that's natural in that context, and we agree, because that's a statute with a relationship to the alien's removal. Same thing in Section 1252. That's the jurisdiction-stripping statute that says that courts of appeals don't have jurisdiction to hear petitions for review by an alien who is removable for certain specified reasons. There, too, the government agrees removable is not the status. It's a reference to the actual charge at the hearing. And they say that's natural in that context, because the statute has a connection to the alien's removal proceeding. So the question in this case boils down to whether the government has put forward a sufficient case for holding that the words inadmissible and removable in the stop-time rule mean something different from what it concedes they mean in these adjacent or nearby statutes addressing the same subject matter. And I don't think the government has put forward that case, because I think that many of the contextual clues that apply in the nearby statutes also apply in the stop-time rule, or at least there isn't a sufficient reason for construing those statutes differently. So, first of all, I think it's important to recognize that the stop-time rule is applied only in the context of removal proceedings after the immigration judge has just decided whether an alien is inadmissible or removable. So there's like two steps. At step one, the immigration judge decides whether an offense renders the alien inadmissible or removable, and then the immigration judge decides eligibility for cancellation. Sotomayor That's not quite true, though. Some aliens concede removability and are seeking cancellation. Goldstein Yes, that's correct. Sotomayor And then there are some that are ordered who are found inadmissible or removable not on the basis of a crime at all. Goldstein So that's true, but in the Sotomayor So you have two classes of people that aren't covered by the way you're reading admissibility now. Goldstein No, but there's still a threshold finding of inadmissibility or removability. It's true there might not be a hearing, there might be a concession, but in the most typical cases it's based on an offense, and in every case there's just been a holding, an adjudication that for some reason the alien is inadmissible or removable. Alito Could I possibly get an argument off the table? Do you really want to argue that the concept of inadmissibility is not a status? Goldstein I think that the word varies depending on the context in which it's being used. So I can't say. Alito That's a different question, but is or is not the concept of inadmissibility a status? Goldstein I think that the word can mean two things. I mean, I agree with you that the ELE sounds like a status, at least in some context. I'm not conceding. I'm not going to argue something that's obviously wrong. There are certain contexts in which the way you're using that word, it sounds like a status. So I agree. If you go to your lawyer before the hearing and say, hey, I want to go to Niagara Falls, am I inadmissible? In that context, it's talking about a status. That's clear. But I also think it's clear that in certain contexts when you're talking about the removal proceeding itself. Alito Give me an example in ordinary speech where inadmissibility is not a status. You just gave the example of you just gave an example yourself where it would be. Somebody is in Europe and is going to buy a ticket to come to the United States. If that person does not satisfy, that person is inadmissible. That person is inadmissible at the time when the ticket is purchased or at the time when the person gets on a bus in Central America to come to the southern border. Or if evidence is inadmissible, it's inadmissible before the attorney tries to admit it at trial, right? So that's true. But it seems to me that when you're using the word in the context of talking about the removal proceeding itself, what you really mean is inadmissible at that proceeding. So again, I think 1226 is a perfect example of this. Okay. So that's what I want to get off the table. So it is a status. You may or may not agree with me. I gather that you don't. But if I think it is a status, then the question is what is the context in which this status can be assessed, right? I mean, I'm comfortable calling it a status if we define the relevant status as status of inadmissible at that proceeding as opposed to status of deregulation. Okay. Then you have to show why in the context of a removal proceeding for an LPR who has not left the country, there cannot be an assessment of inadmissibility of this status. You have to show why that is so. So I think it's for many of the same reasons why we agree with the adjacent statute that that is so. So first of all, just contextually, it seems to me it's quite natural when at step one of the proceeding, there's an adjudication, maybe it's conceded, but there's some kind of adjudication that the alien is, in fact, inadmissible or removable. And then the next step, the immigration judge is asked to decide, does this offense render the alien inadmissible or removable? I just think it's natural to talk about what just happened rather than this new proceeding that imagines what would have happened if the person had left and tried to come back. I also think that the opening stanza of the cancellation of removal statute is actually quite good for us. It says something to the effect of, the Attorney General may cancel removal for an alien who is inadmissible or deportable. That's actually quite a lot like 1226, the mandatory detention statute, in that it has removal and then inadmissible and deportable sort of in the same breath. Alitoso, but do you dispute the fact that there are other provisions in the immigration laws in which inadmissibility is assessed at a time other than when an alien is seeking admission to the country? So, yes, I do. And let me walk through all of those, because I don't – it's almost like the exception that proves the rule in the cases that the government addresses. So the primary example is adjustment of status or adoption of a temporary status, which I think is sort of a constructive admission, like you don't have to leave the country and come back. I mean, when you say it's a constructive admission, constructive is a word that lawyers use in an effort to show that something that is not something else actually is that other thing, right? Yeah. But the point is you're trying to get into a new status, which is sort of like trying to get into a new country. Like, the status is as if you're being admitted into a new status. It's not like a latent – the government says that in 1996 this, like, latent status was conferred on him that just stuck with him for all these years, which is different from when you're affirmatively seeking eligibility for a new status, which is kind of like affirmatively seeking eligibility to enter the country. So I think that's just conceptually different. And, by the way, that doesn't apply to LPRs like Petitioner. There actually is no other context in which the concept of inadmissibility has any relevance to an LPR. The government also has – When can an LPR fit that status? You say if he leaves the country for more than 180 days? Yes. What other – in what other situations can a lawfully permanent resident be subject to the status of ineligibility? So there's – Inadmissibility. I'm sorry. So there's several enumerated criteria. Probably the one most relevant to this case is that the statute provides that if you've committed a crime on the inadmissibility list under 1182 and then you leave, you need to seek admission again. Now, there's one wrinkle on the specific facts of this case, that that statute doesn't apply to Petitioner because he committed his crime before the – Irira's enactment. But in the general mind run – and we're not relying on that as the basis to decide this case. But what else besides leaving the country and coming back? So you're leaving for 180 days, abandonment of the status. I think one of them is committing a crime in a foreign country, and there's a couple of other ones. There's like a list of enumerated criteria in Section 1101. Could you go back and finish your answer to Justice Alito? I understand he asked about the other provisions that refer just to a status. Yeah. And you mentioned the first one, and that seems somewhat logical. But how about the other? So I think that the only other ones are these two for these very narrow classes for temporary aliens, like certain entrance before 1982 and something about special agricultural workers. And actually, those provisions in the sections talking about adjustment of status for those people, it also says that if they're inadmissible, they also have to leave. Their status is terminated. Those statutes were enacted many years, I think in the 80s, many years before Irira. So, I mean, it's different subject matters. It's not about LPR. They're enacted at different times. I think they're less relevant in these cluster of statutes about removal, which were all or almost all enacted in Irira itself. They all address the same subject matter. To me, if you're going to look at consistent usage, those are the ones to use. I actually think that our best argument on consistent usage is maybe just the intro to the cancellation of removal statute. And I mentioned a few minutes ago, but I'd just like to elaborate a little bit. It says the Attorney General may cancel removal for an alien who is inadmissible or removable or deportable, excuse me. And so, like, that's just like 1226. You're talking about removal and inadmissible in the same sentence. And so it just seems quite natural that inadmissible is a reference to inadmissible at the hearing, right? And you can't actually cancel removable. But the point of the overall provision is to allow cancellation of removal for those who've been in the U.S. for a long time and have had clean records. Do you agree so far? Well, clean, it doesn't have to be completely clean. Right, but generally clean, okay. And on the clean record point, the statute excludes those who have aggravated felonies. And then it excludes arguably two more categories, those who have the list of crimes that make you deportable or the list of crimes that make you admissible. So those are three categories that seem to suggest if those have been committed within the first seven years for those latter two, right? The aggravated felony at any time, the deportable crimes seven years, the inadmissible crimes seven years. Why isn't that the overall structure to look at that makes you ineligible for cancellation of removal, if you understand the structure? Well, I think the structure has a different conclusion. I think it's quite relevant that for this aggravated assault offense here, Congress has actually decided that that's not a basis to deport him, period. So, like, it doesn't interrupt his continuous residence in the literal sense that ICE can't come to his house and deport him for it. Congress has decided he gets to stay here, so. Right, but the point is you've already been determined that you're inadmissible or deportable. Yes. Now the question, are you eligible for cancellation of that removal? And the two things that Congress said we should, that IJ should look at are, have you been here for a sufficient period of time? And have you not committed certain crimes? Aggravated felonies, deportable offenses within seven years, inadmissible offenses within seven years. If you've committed anything within those three categories, you're no longer going to be eligible for cancellation of removal. See, I'm not sure that's the right way to read the statute, because what it says is to stop the clock, it's got to be a crime referred to in 1182. That's the inadmissibility list. And then that renders you inadmissible or removable. So the way I look at that is that the first part of that, referred to in 1182, that's the category of crimes that's capable of stopping the clock. And then there's the second part of the statute, which has what we see as, okay, not only does it have to be on this list of crimes, that's the first part, but it has to have this particular type of consequence, which is rendering you inadmissible or removable. And, in fact, that leads to an argument we make about surplusage, that it makes more sense to view the statute that way than the government's way, because under the government's position, at least until it filed its brief in this case, it conceded that the removable portion of the statute was total surplusage. Sotomayor, The only way it can keep to its current position is by disavowing a BIA precedent, Garcia, correct? That's correct. And not only does it disavow it, but I mean, I don't think that it's a very convoluted explanation. It's not very plausible. I mean, the government's position depends on this theory that what Congress was trying to do was distinguish between crimes that are expressly accepted from 1182 and that are merely not listed in 1182, and the exceptions. That's the reason for the removal clause is to get these exceptions in, right? So 1182 says something like all aliens except juveniles who commit crimes involving moral turpitude are inadmissible. The government's view is that that's, like, very different from just saying all adults, even though those mean the same thing, because, like, juveniles are in the exceptions clause, and therefore that stops the clock for purposes of cancellation of removal. That's a very convoluted scheme. And it's somewhat unlikely that the removable clause, which seems to be talking about removable aliens, was actually put in to get in those exceptions. It seems to me now that the government has abandoned Chevron deference and what we're doing is just kind of lining up the two interpretations next to each other and seeing which one's better. I mean, our understanding of why the statute's written the way it is is more plausible. We say it's a — Alito, before you get to that, you make a fleeting reference to Chevron in your reply brief. So do you want us to defer to something? Do you want us to defer to the BIA on anything or just on the decision that you like? Just on the decision that we like, Your Honor. Well, that's what the government is doing. Yeah. So it likes this decision, but it doesn't like Garcia's. I have a principal reason for that, Your Honor. First of all, the government expressly waives Chevron deference on this Gerardo case. And so that's good for us. I mean, it makes it much easier for us that now there's no Chevron deference. And we walk through in our brief that the arguments given in this Gerardo case are clearly wrong. So this Court's case is whole, that even if a statute's ambiguous, you don't defer to an agency decision, that's clearly wrong, which I think is true for this Gerardo case. The government doesn't even try to defend it. They bury it in a footnote. Like, what about the simple, but it has a certain appeal, argument that government has made, this is a very dense statute, but if we ask why would Congress, why wouldn't Congress want the clock to stop when an alien has committed a qualifying offense showing that he has abused the hospitality of the United States? Yeah. So I'd like to turn to Purpose, actually, that it might be a good time to do that. I think that actually our interpretation makes sense, and we have very good reasons for why Congress would have wanted to do what it did. So first of all, I think it's at least somewhat relevant that Congress made the express decision that he shouldn't be deported for this offense. It's true that he's deportable for other offenses, but Congress has also made the express decision that those other offenses shouldn't foreclose cancellation of removal. So if both of those things are true, if you have this one offense which Congress didn't even think was serious enough to deport him at all, and then the other offenses which do make him deportable, Congress has decided to leave the door open a crack for cancellation of removal, to me that sounds like Congress kind of wanted this person to be eligible for discretionary relief. He doesn't have to get it, but at least to have the door open, rather than the scheme where, as the government contends, this conviction which wasn't even serious enough to make him eligible for deportation simpliciter kind of pops back into relevance and springs over the crimes for which he is deportable and becomes the basis for saying that he's subject to mandatory deportability. And just one other thing about what one of the reasons why Congress made the express decision that those other offenses shouldn't foreclose cancellation of removal  is that any blemish, even if it doesn't rise to the level of something that might have made you deportable, is a problem, Congress suggested, by broadening the list of things that could make you ineligible for cancellation of removal beyond those things that just make you deportable in the first instance. Why isn't that a better way to look at it? Because it didn't do that. The reason that we're all here today is that the crimes that made him deportable, Congress decided that they actually don't foreclose eligibility for discretionary relief. That's why we're only looking at this crime that didn't make him deportable. They don't on their own, but if you have something else. No, but the scheme is, it's not like it's an aggravating characteristic based on other things. Like, there's you apply a test and there's certain convictions that apply, and then you can certainly use the same conviction for both in principle. It's not like you take one crime and then you look at what other crimes he has. And so it just, the crimes that stop the clock just don't include the crimes for which he was found deportable. So it's just a little bit strange. Like, you'd think that, so he has his firearms conviction and the aggravated assault conviction. And you think that, you know, either one is worse, either one's worse than the other or they're the same level of bad from the purposes of the immigration system. But it's hard to imagine why a rational legislator and you decide, okay, for step one, for just removability, we're going to say that the firearms conviction is worse than the aggravated assault conviction. But at step two, for the same alien in the same case, the sort of rank order of badness is flipped. In step two, it's now the aggravated assault. That's enough to foreclose discretionary relief, but not the firearms conviction. That's a pretty complex condition. Well, it's because of the timing. It was because of the timing. No, but that's actually not the case, because both those convictions, it's the same day and the same incident. It's just the firearms conviction just, because it's not in 1182. So it's not within the class of convictions that stops the clock. Kagan. Kagan. Well, why do you think, Mr. Unikowsky, if you're right that this statute is set up to look to the proceeding that's just happened, whether it's the inadmissibility proceeding or the deportability proceeding, why is it that it's, that the statute is written just in terms of the inadmissibility grounds? Like, why wouldn't you have something where the inadmissibility people have admissibility grounds and the deportability people have deportability grounds if there's this basic dichotomy in the statute? It's a little hard to explain, Your Honor. I mean, that aspect of the statute is something that has puzzled the BIA as well, because the first part has only one and then the second part has both. But, I mean, you know, that's the BIA has said we have to construe that literally. Congress did this, it was very clear that they're asymmetric. The first part is just one half and the second part is both halves. They could easily have just put in 1182 or 1227 in the first part and then we wouldn't be here because the firearms conviction would be closed. Kagan. I guess my thinking, though, is that it's a puzzle. It's a puzzle for both sides, but it's a little bit more of a puzzle for you because you emphasize so much the way the statute separates out two different classes of people. Well, that's true, but, I mean, it's the second half of the statute that does that. I mean, it's hard to know what to make of that. So there's this BIA decision that holds that firearms convictions, like Petitioners, doesn't trigger the stop time rule. The BIA, actually the government in that case said that's crazy, it's just clear that's the purpose, and then the BIA said, no, look, it's not clear exactly how the statute got to be written this way, but Congress required this asymmetry in which the first part, the referred to part, the category of offenses only has some. And Congress evidently decided that only some offenses and not all should even be capable of stopping the clock, just like it decided that just aggravated felonies should be capable of foreclosing cancellation. And then in the second part, it looked at the effect on the alien. I just want to say one more thing about that. I think it makes a certain kind of sense to say that, like, if you're being deported for a particular crime, then that you can't use the time after that crime to be up to – for purposes of continuous residence, because in a sense it's just sort of bureaucratic delay, right? You've committed the crime, and then you're waiting for the conviction, and then you're waiting for the deportation proceeding. But sort of the die is cast when you've committed the crime. And so there's a certain logic to stopping the clock as of the commission of the crime that really doesn't work here, where Congress isn't even capable of deporting you based on this aggravated assault crime. So the delay after the crime has nothing to do with bureaucratic delay. It's just exclusively based on the fact that Congress has decided not to deport  So it's just— Sotomayor, could you tell me why you didn't rely on Laris Tirasas? On what? Lara Tirasas, the Capital Area Immigration Rights Coalition said that the BIA read this provision pretty much as your second alternative previously. Well, I mean, I think that – so we think that the BIA has not decided the – on the second question. So that Hirado clearly isn't consistent with our first argument. No, but Lara Tirasas appears to have held exactly as you wanted. I don't think that's a published decision that specifically resolved the question. Well, maybe not specifically, but the government's relying on unpublished opinions, too. Yeah. I mean, there's a published decision. I mean, obviously in this case there's an unpublished decision rejecting my client's claim. So, you know, and Hirado is the primary published decision that's on point. We acknowledge that it's inconsistent with our reading, but we said it just shouldn't be deferred to because it's irrational. The government agrees with that. And so that obviously makes this case easier for Petitioner. I will say that if the Court concludes the statute is ambiguous, but nonetheless construes it our way, then under the Brand X case, the BIA would be capable of reaching the contrary conclusion, and a court would be able to defer to that if it holds that the agency's reasoning is reasonable. That's what the Brand X case holds. But, you know, of course, if the Court holds that it's unambiguous, then the agency wouldn't be capable of doing that. But on the record, currently before the Court, when there's no Chevron, no presidential decision that the government is even willing to defer to, or is willing to defend and rely on, it's just like a criminal statute or any other statute where there's no layer of deference to the agency. The Court should just decide what it thinks it means in the first instance. What do you do with the government's argument that it would have been very easy for Congress to write the statute to link the stop-time offense to the offense charged in the removal proceeding? I mean, I think the statute could have been clear both ways. I mean, just looking at this good moral character provision, which is something we talk about in our brief, it's like a model of draftsmanship and how clearly it could have been written our way. I mean, that statute says that if you have committed a crime during the continuous residence period that puts you into the classes of persons described in 1182, then the clock, then you can't be eligible for cancellation, whether inadmissible or not. So that's like the clearest conceivable way of saying that if you're in the category of 11, of people under 1182, which the government says Petitioner is, regardless of whether you're charged with inadmissibility, you're not eligible. So Congress said that was a requirement only for non-LPRs to seek cancellation of removal and not LPRs. And this isn't just a matter of differently worded statutes. It's as differently worded as they could conceivably be. You have like for non-LPRs, it says in the classes of persons in 1182, whether inadmissible or not. And then for the stop time rule, which also applies to LPRs, it requires that it renders the alien admissible. So just to answer your question, I mean, yeah, certainly you could have written it much more clearly our way, and of course we wish it was, but it seems to me that when, you know, when there's just a crystal clear statute that would have accomplished exactly what the government wants, which Congress applied only to non-LPRs and not LPRs. Why would the good time rule clearly resolve this? Never mind. Why would it clearly resolve this question? It doesn't say whether seeking admission or not. It says whether inadmissible or not. Yeah. So it doesn't matter. So we don't think Petitioner is inadmissible, but it applies to the alien whether inadmissible or not, as long as he's in the classes of people in 1182, which he clearly is. Thank you, counsel. Mr. glue. Mr. Chief Justice, and may it please the Court, the statutory text alone is enough to resolve this case. The question is whether Petitioner has committed an offense that renders him inadmissible under Section 1182a2. To find the answer, we look to the text of Section 1182a2, and it says that any alien who is convicted of a crime involving moral turpitude is inadmissible. There is no dispute in this case that Petitioner has been convicted of a crime involving moral turpitude. Therefore, he has been he has committed an offense that renders him inadmissible under Section 1182a2, and that should be the end of the matter. Now, Petitioner says there is an added requirement in the statute, that requirement being that he must be seeking admission. But that requirement can't be found in the text of Section 1182a2. It can't be found in the text of the stop-time rule itself. Rather, the stop-time rule ties the operation of the rule to an alien's status as inadmissible, independent of whether he is seeking admission or not. In that respect, the stop-time rule operates in the same way as many other provisions of the INA. My friend describes some of those provisions as obscure, but I think they're anything but. For example, we cite a number of them on pages 17 to 19 of our brief. One of them is 8 U.S.C. Section 1255a. This was a major part of the Immigration Reform and Control Act of 1986. 1.7 million aliens applied for relief under this section, and what that section says is that those aliens would be ineligible for relief if they had the status of being inadmissible. And that's so even if those aliens were already admitted and not seeking admission. Moreover, that same section says if after being granted amnesty under that provision, those aliens then committed an act that made them inadmissible, that amnesty status would have been terminated. So it works just like the stop-time rule in this case, and indeed mirrors the operation of that rule. Another example is Section 1160. That's another major part of that same act. That said that that gave special temporary resident status to a certain group of agricultural workers. 1.3 million agricultural workers applied for relief under that section, and it operates the same way. Even if those aliens had already been admitted and were not seeking admission, inadmissibility as a status was a criterion for their eligibility for that status. But your friend on the other side, of course, cites statutes that are to the opposite effect in terms of how the term is used. So it strikes me that this business about this is how they use it in other places, it's almost a wash. I don't think so, Mr. Chief Justice. In our view, the word inadmissible means the same thing throughout the INA. Every time the word inadmissible appears, it is referring to an alien status under Section 1182a2. What the statute does in other provisions is tie different consequences to that status. So my friend mentions the judicial review provision in Section 1252a2c. What that provision says is if an alien status as inadmissible has the consequence of leading to a decision about his removal, then there's no judicial review in the courts of appeals. So in other words, that statute does exactly what the stop-time rule doesn't. It refers specifically to the decision to remove and ties the operation of the rule to that. Same with the mandatory detention provision. This is 8 U.S.C. Section 1226a and c. There's an explicit reference there to the decision whether the alien is to be removed. And what the statute says is if the alien status as inadmissible would result in that particular consequence, then that alien can be detained on a mandatory basis. Breyer. Look, the main argument, as I understand it, in this statute is as obscure as any I have seen. All right. Look. Let's read it. When the alien has committed an offense referred to in Section 1182a2 of this title. So we go look and see. Has he committed an offense referred to? Yes. Now, then what? An offense that, A, I put in the A, renders the alien inadmissible or, B, removable under 1227a. Now, if you're right, there was no need for that clause, the second clause. Because the first thing you do is look to 1182. 1182, if his offense isn't there, forget it. It doesn't apply at all. And if his offense is there, well, under your view, remove him. That's the end of it. So what in heaven's name is removable from the U.S. under 1227a doing there? Now, he has an answer to that question. He says, I'll tell you what. The history of immigration law is that we treat differently applications for admission. Even people we found in the United States, by the way, who never applied for admission. Okay? Those are the inadmissible ones. And those are the ones that what I called A applies to. And now what B applies to is everybody else. They were properly admitted, yes, yes. And then they committed a crime deportable under. Now, he happens to fall his client within what seems to me is a tremendous fluke. That is, somebody who actually did something that is listed in 82a, and yet, at least in his view, is not listed in 1227. I didn't know there was such a person. But lo and behold, he comes up with this exceptions clause, et cetera, and says his client is there. Okay. Now, what do you say to that main argument, that there's A and there's B? And in your view, B serves next to no purpose. When Congress wanted to make A and B an either or, it said so expressly in the Act. I know, but I can't think of that. That's not going to be an answer, because they'd say sometimes they do say AB, sometimes they don't say AB. It wasn't a genius who drafted this. And he forgot the A and the B. And he did put in the or. And so, all right, I got that point. What's your next point? My next point is, I think, well, I guess two points. One is, we don't think the Renders Removable Clause is superfluous when the referred to in Section 1182a2 clause is given its proper meaning. But, and I'm happy to get into that. Even if you don't buy that and you think there's some superfluous left. Well, you're talking about the ones who are the under 18 and there's an exception. I think I got that argument. And I can think that if I think I have it, you're right about it. Even if you don't buy that? Even if you don't buy that, I don't think surplusage should be the be-all, end-all in interpreting this statute. Even under Petitioner's reading, the cross-reference to Section 1227a4 was pure surplusage from 19. But, Mr. Lew, this is more than your typical case of surplusage. I mean, obviously, surplusage sometimes gives way to other things. But this whole statute, like the structure and the content of this statute, is all written to defer, to refer to this essential dichotomy that Justice Breyer just set out. I mean, basically, the back two-thirds of the statute is all about, well, the people who have been rendered inadmissible. And on the other hand, the people who have been rendered deportable. And, and you have to think that they wrote it that way because they were thinking of these two groups of people, each of which would be subject to different consequences and each of which should be looked to separately. I don't think so, Justice Kagan. And I'll just reemphasize the point I made to Justice Breyer, which is when Congress did want to create that dichotomy, it wrote that dichotomy into the statute. So by doing what? You said by saying either or. I mean, this statute says or. You know, any writer would tell you sometimes you put it in either, sometimes you just use an or. Either way, it's disjunctive. It's much more explicit than that. If you look at the page, top of page 35A of our statutory appendix, you have Congress defining the meaning of the word removable. And we acknowledge decisions to remove are the main, I think the only context in which Congress wrote into the statute this either or. And how did it do it? It did so by defining removable as, quote, in the case of an alien not admitted to the United States, that the alien is inadmissible, or B, in the case of an alien admitted to the United States, the alien is deportable. That's how explicit Congress is. It's not just either or. Well, it's how explicit Congress could be. And sure, that might be a model of legislative drafting, which we can all assume this statute is not. But this statute does very clearly use the disjunctive as to two large clauses, one of which talks about inadmissible aliens, and the other of which talks about removable or deportable, whatever word you want, aliens. And I think Congress was also clear in the cross-reference to Section 1182a2 in the renders inadmissible clause that any alien who is convicted of a crime involving moral turpitude is inadmissible. There are many ways Congress could have written that provision to get to the result Petitioner would like us to get to. There are other provisions in 1182 that tie the status of inadmissible to an alien who is at that time applying for admission or seeking admission. But in 1182a2 itself, Congress left those words out. And I think usually this Court presumes that Congress acts intentionally and purposefully when it does something like that. Sotomayor, back to the point that the Chief Justice made, you're cherry-picking. What Congress has not been is very consistent, except in what your adversary points to in the basic structure, that inadmissibility applies to people who have not been admitted, deportability applies to people who have been admitted. And each side is given a different set of rights. Each side is given a different set of burdens. Each side is given a different set of benefits or lack thereof. And I don't see what's illogical to say that what Congress was thinking about is if you're in removal proceedings, you're eligible for cancellation of removal for those crimes that make you eligible. Meaning, if you have to be mandatorily deported, you have to be mandatorily deported. But you've been here a long time. Whether a piece of it was in BIA custody or not is irrelevant. You get the same benefits for being a long-time resident as you do in all parts of the INA. You have to prove certain things in LPR status. There are certain benefits given to LPR. Why is that in Congress here? Especially when the structure of the very next provision, the mandatory detention section, is talking also about removability. I want to be very clear. I do not think we're cherry-picking at all. We are giving the word inadmissible the same consistent meaning throughout the INA. We are then reading the language around that provision, and sometimes that language points to a specific consequence of that status. This provision attaches an additional. Sotomayor There is a consequence. Both of them are tied around removability. There is a consequence. Or at least the ability to ask for a consequence. But the consequence here, which is termination of the period of continuous residence, is tied only to the status of inadmissibility. Congress could have written even the stop-time provision itself in many different ways that would have captured Petitioner's reading. In fact, the predecessor version of this statute, former section 1244A, said if the alien commits an act constituting a ground of deportation, that person is eligible for suspension. Breyer But you can read the word inadmissible. I'm not saying you have to. But you could say this individual in front of us, he's not inadmissible. He's been admitted. How could he be inadmissible? They admitted him. Ah, you mean he would have been inadmissible had he not been admitted. Okay? Now, that's a possible reading of it. And that's why just looking at the word inadmissible doesn't tell us whether we should read it with the he would have been or whether we should read it as would he be now or if they're 15, not 50. Okay, got that. Now, once we're into that bog, we then go back to the original question of why in heaven's name, if all you had to do is first you look at 1182 and see if his crime fits there, and then you see if it made him inadmissible for everybody. Well, of course it did. I mean, you know, there we are. And what's this second part doing there? Unless it picks up that traditional history. Now, that's the same question asked before, the same question Justice Kagan asked, and that's, I think, what's bothering us. This is what we think Congress was thinking. Everyone agrees that Congress began with the universe of offenses referred to in Section 1182a2. Everyone agrees that's text in the statute. You can't have a 1227 offense unless that stops the time. Unless it's referred to in Section 1182a2. And we think what Congress was trying to do was it looked across the INA and it said, look, we have identified in Section 1182a2 a set of criminal and related offenses. We think in general, those are the offenses that rise to the level of being an abuse of the country's hospitality such that the alien's time would stop. And then Congress thought, well, certainly if those offenses are serious enough to render the alien inadmissible, those should be given stop-time effect. And so why wouldn't you just say, you know, a person convicted of an offense listed in the following sections? You don't need all this hullabaloo about people being rendered inadmissible and people being rendered deportable unless you're talking about some kind of proceeding in which people have been rendered inadmissible or people have been rendered deportable. Otherwise, you could just say offenses listed in whatever statutes you wanted to say. Well, because I think, as I was saying, Congress did start out with a set of offenses that thought would generally be serious enough. Those are the offenses referred to in Section 1182. Congress thought, well, if they are serious enough to render the alien inadmissible, they should certainly qualify as stop-time effect. But at the same time, Congress recognized that there were exceptions in Section 1182, juvenile offenses, petty offenses, that wouldn't be – if you just said listed in the – it doesn't transform an exception. An exception would remain the exception. It's just the actual offenses that are listed in that statute. Well, I think that is what the referred-to clause – the referred-to clause refers to just the offenses, the sort of the generic elements-based understanding of the offenses in the statute. The problem is, I think Congress realized Section 1182a2 contains a bunch of circumstance-specific exceptions to those – to those provisions. Yeah. I guess it seems really counterintuitive to me that Congress could have sort of looked down the road and said, some insane judge is going to pick up these exceptions and transform them into actual grounds for disqualifying somebody from removal. So the exceptions would remain the exceptions. You don't need all this statutory language to do that. That's my point, Justice Kagan, is that because of those exceptions, that's why you need the renders. Yes, that's your point. I mean, look. Can I take you back to Justice Breyer's intriguing question about the meaning of inadmissibility? The Eleventh Circuit had some very colorful examples about status and words that end in A-B-L-E or I-B-L-E, and one of them had to do with rotten fish. So if a fish rots and it is inedible, they say, well, it was inedible before the person ate it. But under Justice Breyer's interpretation of admissibility, suppose this person eats the fish and then goes to the emergency room to have his stomach pumped. Would the doctor say, well, the fish wasn't actually inedible because he ate it? No. No, you wouldn't. Because the fish has the status of being inedible, whether someone has eaten it or is trying to eat it or not. But this really is dependent on context, because you wouldn't say a car is immovable if the car has just been moved. And so to hear, it's not clear that you would say an alien is inadmissible if the alien has just been admitted. So, you know, it could, it couldn't. The real question is not what inadmissible means in the abstract. The real question is look at this statute and say, why does anybody write a statute that looks like this, unless what the drafter is doing is to try to refer to two different categories of people who have just gone through two different kinds of removal procedures. And I don't think it's an embarrassment for our position that under our view, the Render's Removal Clause has only a modest role to play. Again, if you read the text of the Stop Time Rule, you begin only with offenses referred to in Section 1182A2. If Congress had wanted Section 1227 to play a sort of major role in the Stop Time Rule, it could have said offenses referred to in Section 1182A2 or referred to in Section 1227. But already Congress is cutting off the application of 1227. This is an inadmissibility-focused provision. Two of the three provisions are about Section 1182A2. I think it's only logical to read the third provision, which doesn't mention Section 1182A2, as doing the relatively modest role, admittedly, of just picking up the things that aren't referred to or render an alienation. Breyer. Well, before you leave this, I'll think about the fish. I'm not sure I've got the fish, but I'll think about the fish. But I'm back, and what in heaven's name is that clause doing there? You know, the second clause. If you're right. Okay. So you've had very brilliant people going over this. And the best they've come up with, it seems to me, is, well, you see, there are exceptions in 1182, and those exceptions are not in 1227. And they put 1227 in to be sure those exceptions didn't stop the person from being deported. Okay. So I look at the exceptions. The only exceptions I can find that are relevant are those contained in A1, A2, A, small 2, big 1, and 2. Those are the ones you're talking about. And by the way, it took me five seconds to put all those numbers in. But it takes a Congressman or a drafter only three seconds to read them. And I would have said, including those listed in, and then I would have put in that number. You see? That would have done it. Including those listed in, and I would have put that number in. And then there would have been no problem, and then you would have thought of no reason at all. Now, I've never seen a statute drafted so many words to cover removing so small an exception. But we know Congress wasn't working at that level of granularity, because when it came to 1227A4, there was nothing in 1227A4 that's referred to in Section 1182. I think the only way to understand what Congress was thinking is to think of what Congress was thinking at a more general level. And the more general level is, we have these offenses referred to in 1182A2. These are bad offenses. If they're serious enough to render you inadmissible, that is, confer that status, then they stop the time. But if they also happen to be serious enough to render you removable, those will stop the time, too. That doesn't mean that you don't apply the Section 1182 renders inadmissible language, even in cases when aliens are admitted, because Congress had written provisions in many other places of the INA where inadmissibility is indeed relevant even when the alien is admitted. So Congress did not think there was some sort of disjunct between saying an alien was already admitted and yet he's inadmissible. It wrote the statute in exactly that way. That's confirmed by the language of 1182, which says any alien convicted of a crime involving moral turpitude is inadmissible. It doesn't say any alien who is convicted and then seeks admission. It's clear from the other provisions, adjustment of status, temporary protected status, the two major parts of the Immigration and Reform Act of 1986 that I mentioned at the outset. It's even clear if you look at a provision of 1227, 1227-2A, 1227-A1A, deportable aliens. This is 20A of our petition appendix. It talks about aliens who at the time of entry or adjustment of status are within one of the classes of aliens inadmissible. There's no adjudication of admissibility at that point. The whole point of this deportability provision is that the immigration officer failed to adjudicate that person as inadmissible. And yet the statute refers to that person as having that status of inadmissible such that another consequence can be attached to it later on, in this case deportability. We think the stop time rule works in the same way. Sotomayor I know that everybody, I think Justice Kavanaugh and you, seem to think that these minor offenses like a person who possesses a small amount of marijuana can, that can make you inadmissible. But not deportable because there's an exception under deportability. If it's a juvenile offense, you can't be deported. But what you're now saying is that these minor offenses stop you from getting the benefits, potential benefits of cancellation of removal. And that that was clearly Congress' intent. I don't know why I should think that is clearly Congress' intent, given that the LPO, that the INA throughout gives more solicitude to long time, to permanent residents. I mean, I just don't see how we can turn the presumption on its head and say that they weren't intending to limit this stop time. Rule to those who were in an invisibility status. Covers small numbers of LPRs, the ones that have left the country and are seeking readmission, and others. But I'm just not quite sure I understand why your reading is consistent with the solicitude that Congress has showed LPRs throughout the INA. I think it has to do with the very narrow issue in front of this court. No one thinks that a mere marijuana possession conviction alone can render an LPR removable. No one thinks a mere marijuana conviction alone can even render an LPR categorically ineligible for cancellation of removal. The only question here is a question of the operation of how long after having convicted that offense, can that alien continue to claim credit for being in the United States? That's a very narrow question. And our answer is simply- The problem really is, no, it's not so simple. Because they didn't or wouldn't have to worry about a small amount of marijuana generally, even an admission of it without a criminal conviction. And so why should the time stop under those circumstances? Well, other than your strange reading of this provision. Well, I think the text does favor us. But if you look at this cancellation of removal- If it doesn't, where do we end up? If it's ambiguous, where do we end up? If it's ambiguous, I think there would have to be some grievous ambiguity for the court even to even care about that. I think the traditional tools of construction continue to apply. How about if it's in equipoise? If it's in equipoise, I still think the court's duty should be to reach what it believes to be the best reading of the statute. I don't think- And so by ignoring surplusage completely? No. I think surplusage is a problem for both of our interpretations. I mean, even under- It is a lot less. He gives meaning to everything except the reference to 1227a-4. But doesn't 1227, it wasn't, it was an empty category back then? Yes. I've forgotten. It was an earlier version. Well, since the stop-time rule was enacted in 1996 all the way until 2004, 1227a-4 was an empty category. And even today, it's a largely redundant category, because Congress has said in cases of certain permanent residents and non-LPRs under 1229b-a and b-1, if you have a conviction under a-4, you're just categorically ineligible. It's not even a matter of stopping time. If you have an a-4 conviction, you can't get cancellation right off the bat. So even today, that provision is not doing a ton of work. Mr. Liu, could you make sense of the verb tenses for me? Because I would think that you would have an extremely good argument if the tenses were subjunctive, you know, if it said, if it would render the alien inadmissible. But it doesn't say that. It says renders the alien inadmissible, which seems not to refer to something that could happen in the future if the alien, again, tried to gain admission. Right. And I think the renders inadmissible, the present tense, just reinforces our interpretation, because if you look at the text of 1182 itself, it says any alien convicted of a crime involving moral turpitude is inadmissible. So for the tenses to match, the present tense in 1182 itself to match with the stop time rule, I think the present tense makes a lot of sense. And I think this is in partial response to Justice Breyer's question. Our position is not a hypothetical alien would be inadmissible, and therefore, time stops for this alien. Our position very much is for this particular alien, this offense renders him inadmissible. And that just follows from the text. I mean, it just is a kind of odd thing to say when we know the alien has been admitted and could be, you know, could live here indefinitely if he hadn't gotten into other trouble. Right. I don't. Nobody walks around going, oh, you've been admitted, but, you know, you know, let's try to if you try to gain admission the next time around. I mean, I don't think that's right. I mean, if I were a lawyer representing a client who had already been admitted, I would definitely describe the consequences of his status as inadmissible after he had committed a crime like this. And I would use the present tense to be exceptionally clear about those consequences. I think there is a different verb tense change here between alien has committed and renders inadmissible. But that just, I think, dovetails with our understanding as well, because the rendering inadmissible always has to occur after the alien has committed the offense. Is your point about A-4 because it's an aggravated felony? No, no. What's your A-4 point? 1227 A-4 covers security-related grounds for deportability. So if someone has engaged in terrorist activity, for example, he would come within the scope of A-4. If you look at 1229 B-C-4, this is on page 37 of our petition appendix, it says, an alien who is dot, dot, dot, deportable under section 1227 A-4 is simply categorically ineligible for cancellation of removal. And that applies to two types of cancellation, not all the types, but the two types that we've been discussing here today. Thank you. Thank you, counsel. Five minutes, Mr. Unikowski. Thank you, Mr. Chief Justice. I'd like to begin by a comment that my colleague made, that they are giving the word inadmissible the same consistent meaning across the statute. That's just not accurate. So in the mandatory detention statute, it says that an alien who is inadmissible by reason of having committed an offense under 1182 is subject to mandatory detention. Giving that word the same consistent meaning would apply to any alien who merely has the status of inadmissible, even if you've already been admitted. That's what they say inadmissible means in the stop time rule. They concede that that can't be right. An already admitted alien can't be inadmissible for purposes of that statute. So they are giving it a different meaning. Now, the Chief Justice posed a question saying that, well, it seems to be, you know, on both sides, and so it's a wash. I think if it is a wash, that's very good for us because there's all the other stuff. There's the surplusage, there's the comparison to good moral character, and there's the structure of the INA and everything else. But I'd just like to push back a little bit on the idea that it's a wash because it seems to me that the statutes we're comparing it to are more relevant than the ones they are. So like this mandatory detention statute, it's covering removal procedures. It was enacted in ARERA along with the stop time rule, just a couple sections over. That strikes me as more relevant than provisions that were enacted many years earlier that don't apply to LPRs at all, which is what the government is relying upon. So I actually think that the consistent usage canon favors us, especially when you look at just the intro to the cancellation of removal statute that says the attorney general may cancel removal for an alien who is inadmissible or removable. Like, that's using inadmissible in the way we say, and it's the same statute. In fact, like, the stop time rule is just a definitional provision under that umbrella. So the second thing I'd like to turn to is this question about the fish, which was a colorful question by Justice Alito that the Eleventh Circuit relied on similar arguments. Look, we're not denying that it's – that you can BLE where it sometimes sounds like a status. Clearly, that's true. But it's just as clear that sometimes it's obvious that when you're talking about the removal proceeding itself, the word inadmissible refers to what happened at the removal proceeding. So I just think it's inescapable that you have to look at the context in which the word appears. I don't think that, you know, the Eleventh Circuit's comparison to undrinkable really can answer the question presented. And in the context of the statute, which applies only during removal proceedings in which all the surrounding provisions seem to conceptualize this dichotomy between inadmissible and deportable, I think the context, which you just kind of have to look at, ultimately favors our position. I'd also like to just say a word about surplusage, which I understand occupied a portion of the – of my colleague's argument. So first on this narrow issue of 1227a4, just to be clear, it's not as though the government's interpretation gives that meaning that ours doesn't, right? So 1227a4 was really an empty category at the time because it didn't have any cross references to 1182. That's true on both sides. So it's not a – it's not one of those cases where both sides give one word meaning that the other side doesn't. Like, for both sides, it's not clear why Congress included that, except for the purpose of subsequent amendments, which actually did ultimately materialize. But the surplusage on the government side is a lot more significant in the whole that the removal clause isn't there. It's not just a matter of that there's surplusage. I mean, surplusage is generally bad, but I think here it's more than that. You see the words inadmissible and removable paired with each other, and I think that just implies that Congress is thinking that those are the two things that can happen to you. And if you're inadmissible, you fall in one bucket, and if you're removable, you're in another bucket. And we see all over the adjacent statutes this concept of inadmissibility and deportability together with an or in between, and it's clear in all those contexts that that's why that's – that's why they're there, because those are the two true outcomes. So just in the intro of the cancellation removal statute, where it says the Attorney General may cancel removal of an alien who is inadmissible or deportable, clearly the reason those two things are paired together is that those are the two things that can happen to you, and so that's why they're both there. And same in the – just the general statute governing removal procedures, 1229a, that says that the immigration judge shall decide the inadmissibility or deportability of an alien. It's clear why those two words are there with the or in between, because those are the two things that can happen. So you go to the stop time rule, which, after all, is just like a very definitional provision in the cancellation of removal statute itself, and you have inadmissible or removable, and the natural inference is that the reason those are there is that those are the two things that can happen. That fits our interpretation perfectly, because if you're found inadmissible, then you're in the admissible category, and if you're found deportable, then you're in the deportable category or removable category. Excuse me. I think that's a lot more persuasive than this rather convoluted argument from the government, which apparently the government didn't even think of until it's briefed in this case, because it explicitly did not make this argument in a bank petition filed less than a year ago. Thank you. Thank you, counsel. The case is submitted.